**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **MELISSA BROWN,** | : | **CASE NO.** |
| **On her own behalf and on behalf of** | : | |
| **O. B., a minor child** | : | |
| | : | |
| **PLAINTIFFS,** | : | **JUDGE _____** |
| | : | |
| **vs.** | : | |
| | : | |
| **CINCINNATI PUBLIC SCHOOLS** | : | **VERIFIED COMPLAINT FOR** |
| **BOARD OF EDUCATION,** | : | **INJUNCTIVE RELIEF AND** |
| | : | **MONETARY DAMAGES** |
| **LYNCHBURG-CLAY LOCAL** | : | |
| **SCHOOL DISTRICT BOARD OF** | : | |
| **EDUCATION,** | : | |
| | : | |
| **HAMILTON COUNTY JOBS AND** | : | |
| **FAMILY SERVICES,** | : | |
| | : | |
| **TAMARA HARRISON,** | : | |
| **in her individual capacity,** | : | |
| | : | |
| **OHIO DEPARTMENT OF** | : | |
| **EDUCATION,** | : | |
| | : | |
| **STATE OF OHIO,** | | |
| | | |
| **JOHN DOE,** | | |
| **(as necessary party)** | | |
| **c/o HCJFS** | | |
| | | |
| **DEFENDANTS.** | | |

## INTRODUCTION

1.      Plaintiff Melissa Brown ("Melissa" or "mom") is the biological mother of 18-year

old John Doe ("John Doe"), a student with developmental disabilities and significant

behavioral, emotional, cognitive, and other challenges.  According to a psychologist

previously affiliated as John Doe's guardian-ad-litem with ProKids in Cincinnati, Ohio (a non-profit organization funded in substantial part by Hamilton County), Melissa has been, is, and always will be John Doe's mother. Plaintiff O.B. is John Doe's 16-year old brother. John Doe's challenges include autism, complex trauma injuries, bipolar disorder, oppositional defiant disorder, ADHD, sensory and processing disorders, receptive language deficits, growth disorder, and others. Melissa and O.B. bring this Complaint against Cincinnati Public Schools Board of Education ("CPS"), Lynchburg-Clay Local School District Board of Education ("Lynchburg"), Hamilton County Jobs and Family Services ("HCJFC"), Tamara Harrison ("Harrison"), the Ohio Department of Education ("ODE"), and the State of Ohio ("Ohio") because Melissa and O.B. face imminent ongoing injury from the Defendants' unlawful conduct depriving John Doe of a free and appropriate public education ("FAPE"), from the Defendants' depriving John Doe of equal nondiscriminatory access to educational resources and services available to students without disabilities, from imminent ongoing injury from HCJFS's unlawful retaliation against Melissa for advocating John Doe's rights as an individual with disabilities, from the Defendants' barring Melissa, O.B., and John Doe from establishing a relationship under law that would allow Melissa and O.B. to assist with planning for John Doe's education, and for redress of violations of rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794 ("Section 504"), the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1401, *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et seq*., and the United States Constitution pursuant to 42 U.S.C. 1983.

2.     Melissa asked this counsel "How is it possible for these injuries to happen to me, O.B., and [John Doe] in the United States in 2019 and I'm not even allowed to try to stop

the injuries?" Melissa asked: "How is it possible that strangers to John Doe's life can make ruinous decisions that are destroying his education and life potential?"

3.      It is futile for Melissa to file an administrative due process proceeding with ODE because ODE has instructed Melissa that she is *not* allowed to file an administrative due process proceeding with ODE. The Defendants have each expressly refused to provide Melissa current educational information about John Doe. Nevertheless, Melissa, as John Doe's biological mother and intended custodian, has sufficient information to attest to the facts in this Complaint. The Defendants are barring Melissa from becoming John Doe's power of attorney for educational decision-making, barring Melissa from becoming John Doe's "appropriate person" for educational decision-making as required by 20 U.S.C. 1415(m)(2), and barring Melissa from personally appearing in Hamilton County Juvenile Court or Hamilton County Probate Court to seek a ruling allowing her to help John Doe secure his right to FAPE from CPS.

4.      John Doe is at risk for injuring himself and others including, but not limited to, Melissa and John Doe's younger brother when the family is reunited, if the Defendants do not now provide John Doe his lawful educational and other entitlements. This Complaint seeks preliminary and final injunctive relief because CPS and Lynchburg have deprived John Doe of FAPE and continue to deprive John Doe of FAPE. The Defendants are injuring Melissa and O.B. because they cannot help care for John Doe unless CPS and Lynchburg provide FAPE and also sufficient compensatory education services to allow John Doe to develop to the levels he would have developed had CPS and Lynchburg provided an appropriate education in the first place. The Complaint seeks injunctive relief against HCJFS because it has failed to properly advocate to secure FAPE for John Doe.

The Complaint seeks injunctive relief against the Ohio Department of Education ("ODE") because it actually found that CPS deprived John Doe of FAPE but then ODE failed to secure ongoing FAPE and compensatory education services for John Doe sufficient to allow him to develop to the levels he would have developed had CPS provided FAPE in the first place. The Complaint seeks monetary damages for Melissa's emotional distress, pain and suffering, and other injuries caused by HCJFS's and Harrison's retaliatory conduct against Melissa for engaging in statutorily and constitutionally protected speech and advocacy for John Doe, for acting in an arbitrary and capricious manner against Melissa, and for other unlawful deprivations.

5.      Melissa currently has visitation rights with John Doe and is his intended permanent custodian according to John Doe's wishes and Melissa's wishes.    In 2016, Melissa voluntarily relinquished custody of John Doe to HCJFS in order to protect O.B. from John Doe's dangerous behaviors but the family members have always maintained their mutual love for one another. Melissa followed the advice of HCJFS and her own lawyer in 2016 that she had no other option but to voluntarily relinquish her parental rights for John Doe if she wanted governmental services for him. It cannot be repeated too much: This is *not* a situation where the government terminated a mother's parental rights because of abuse and neglect. There has been no abuse and neglect. Melissa acted solely to protect O.B. and without anticipating that the government defendants would abuse their position in this matter and cause John Doe to be deprived of FAPE. Melissa and John Doe have always loved one another, they have had a continuous *de facto* parent-child relationship, and they want to be reunited.

6.      There is much love between Melissa and John Doe, and between O.B. and John Doe, but also between John Doe and other family members including extended family. John Doe recently wrote to Melissa:

> Hi, Mom, [O.B.], and Bango.  Hey guys I really miss you so much, and I want to see all three of you guys.  Ive been listening to a lot of Oldies music (Thanks to [O.B.].  While I write this letter, I'm listening to (Crockadile [sic] Rock, by Elton John.  I'm getting my boot off on Wednesday, and I will be able to walk again, and put on a shoe (I WILL BE SO glad.  Anyways, how is [O.B.'s] job?  And I did vet [sic] your letter you sent on Sheila's e-mail.  I love you all so much, and I hope to see you all soon.
>
> I LOVE YOU
> [JOHN DOE]

John Doe further expressed to Melissa:

> I got your [August] letter, and I love you also, higher than the sky, deeper then [sic] the ocean, principle [sic] said that I could not do the photography class, because I'm graduating in Dec.  See you soon, love [John Doe].

7.      With all the commitment and love a mother and brother can have for a child and a sibling, Melissa and O.B. seek prompt equitable relief from this Court because without that relief John Doe will remain a risk to himself and others. Without that equitable relief, the Defendants will exit John Doe early from his public education and he will forever lose the opportunity for the same kind of equal access to services and resources available to other students with disabilities and to students without disabilities and will lose his access to special education individually tailored to meet all his needs.  Melissa and O.B. have no other forum or means available to them other than the equitable authority of this Court to prevent ongoing injury to them and to John Doe.   In order for Melissa and O.B. to reunite with John Doe in a common household CPS and Lynchburg must provide John Doe prospective FAPE and must remedy its prior deprivations of FAPE.

8.    IDEA expressed our country's "policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. 1400(c)(1).  IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs *and prepare them for further education, employment, and independent living.*" 20 U.S.C. 1400(d)(1)(A) (emphasis added).  IDEA further intends "to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. 1400(d)(1)(B).  IDEA requires all-important "effective transition services to promote successful post-school employment or education" and that providing effective transition services "is an important measure of accountability for children with disabilities."  20 U.S.C. 1400(c)(14).  The Defendants have not provided John Doe "effective transition services" and have not prepared John Doe for "further education, employment, and independent living."

9.    Decades ago, the United States Supreme Court held how CPS must attend to the needs of students with disabilities like John Doe:  "We therefore conclude that the 'basic floor of opportunity' provided by the . . . [Individuals with Disabilities Education Act] consists of *access to specialized instruction and related services* which are individually designed to provide educational benefit to the handicapped child" (emphasis added). *Board of Education v. Rowley*, 458 U.S. 176, 201 (1982).  In *Rowley*, the school district did, in fact, provide the student "substantial specialized instruction and related services." CPS and Lynchburg have not provided John Doe substantial specialized instruction and related services.

10. In 2017, in protecting the educational rights of a student with autism, the Supreme Court further enhanced the rights of students with disabilities by holding that a court must decide whether the IEP's substantive educational plan was "reasonably calculated to enable a child to make progress appropriate *in light of the child's circumstances.*" *Endrew F.*, 137 S. Ct. 988, 999 (2017) (emphasis added). By the time of disputes, the Supreme Court expects school districts "to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.* at 1002 (2017). CPS and Lynchburg have never offered a cogent and responsive explanation how their insufficient education was reasonably calculated to allow John Doe to make progress in all domains in light of his circumstances.

11. In 2018, *citing Endrew F.*, the United States Court of Appeals for the District of Columbia emphasized that the Supreme Court "*raised the bar* on what counts as an adequate education under the IDEA." *Z.B., et al. v. District of Columbia*, 888 F.3d 515 (D.C. Cir. 2018). The *Z.B.* Court of Appeals explained that an "IEP operationalizes a specific student's appropriate educational plan: It sets out, in writing, the student's existing levels of academic and functional performance, establishes appropriate goals, and describes how the student's progress toward those goals will be measured . . . . *Failure to follow those procedures is actionable where it denies the child an appropriate education.*" 888 F.3d at 519 (emphasis added). The Court of Appeals instructed:

> Applying the IDEA as interpreted in *Endrew F.*, we must ask whether, in developing the 2014 IEP, DCPS adequately evaluated Z.B.'s particular needs and offered her an IEP *tailored to what it knew or reasonably should have known of her disabilities at the time. See Endrew F.*, 137 S.Ct. at 999. Without the requisite assessment of Z.B.'s needs as of the time the 2014 IEP was drafted, neither the IEP team nor reviewing officer nor the district

court could determine what services were needed to provide an appropriate education, nor could we.

*Id.*, p. 524 (emphasis added).

12.     The Defendants failed to implement the Supreme Court's 2017 admonition in *Endrew F.* to serve John Doe in light of all John Doe's circumstances. CPS and Lynchburg declined to provide John Doe all necessary present levels of performance, all necessary measurable goals, and all necessary specialized instruction. CPS and Lynchburg declined to provide John Doe related services. CPS and Lynchburg declined to provide John Doe all necessary accommodations and modifications. CPS and Lynchburg failed to provide John Doe appropriate transition planning and services. CPS and Lynchburg unlawfully delegated to HCJFS educationally decision-making for John Doe and unlawfully allowed HCJFS to predetermine John Doe's educational programming.

13.     To achieve FAPE, CPS and Lynchburg are required to address all of John Doe's special education needs in his IEP. IDEA specifically requires that in addition to specially designed instruction, accommodations, and modifications, school districts must provide supportive services as required to assist a student with a disability to benefit from special education including, among others, speech-language pathology services, audiology services, interpreting services, psychological services, physical and occupational therapy, recreation therapy, counseling services, school health services and school nurse services, social work services in school, and parent counseling and training. Parent counseling and training includes "helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP." Social work services includes "group and individual counseling with the child and family" and "working in partnership with the

8

parents and others on those problems in a child's living situation (home, school, and community) that affect the child's adjustment in school." CPS and Lynchburg did not lawfully address all John Doe's special education needs, procedurally or substantively, and are thereby preventing Melissa and O.B. from reuniting with John Doe and otherwise helping him progress.

14.     CPS and Lynchburg failed to ensure that services provided to John Doe were appropriate, research-based, implemented with fidelity, and rendered by trained and qualified professionals. CPS and Lynchburg are thereby preventing Melissa and O.B. from reuniting with John Doe and otherwise helping him progress.

15.     Melissa and O.B. have no other option but this lawsuit and without relief they will be unable to reunite John Doe with his family since John Doe is at risk of harming himself and others. Without relief, Melissa and O.B. will unable to prevent John Doe from losing irreplaceable life experiences and opportunities. Those injuries are attributable to the Defendants' culpability of failing to provide FAPE to John Doe, obstructing Melissa's access to John Doe, refusing to provide Melissa important educational information about John Doe, and collaborating with one another to diminish and injure John Doe's life contrary to the requirements of federal law.

16.     Dr. Vanessa K. Jensen, Pediatric Psychologist with the Cleveland Clinic, is in the process of providing a professional consultation about the level of John Doe's functioning and the appropriateness of educational services (to the extent feasible under the circumstances). Dr. Jensen's preliminary conclusions include: "In over three decades in this field I cannot recall seeing a patient or providing a consultation regarding an individual who has had as many changes in educational placements related specifically to

behavioral and psychiatric disturbance, as many days in residential and other out-of-home placements prior to reaching the age of majority, or as many days in inpatient psychiatric care as are documented in the records I have reviewed for this consultation." Attached letter and CV. **Exhibit A**.

17.    Dr. Jensen stated: "I would agree with JD's diagnosis of Autism Spectrum Disorder (ASD) but JD also appears to have a comorbid psychiatric disorder with at least episodic difficulties in maintaining adequate behavioral and emotional control and adequate reality contact." Also: "Based upon the information available, I would agree with JD's diagnosis of ASD and likely with his diagnosis of ADHD. Importantly, JD also likely suffers from one or more comorbid serious psychiatric disorders, demonstrating persistent difficulty maintaining adequate behavioral and emotional control and very questionable appropriate judgment and decision-making capacity."

18.    Dr. Jensen added: "I would estimate that reports of JD's cognitive skills as within the Low Average to Borderline range, with some areas of much more impaired functioning, is a more accurate representation of his ability at this time." The records available to Dr. Jensen did not evidence "specific interventions in place that were even remotely likely to result in educational progress." Dr Jensen emphasized that based on information available to her, there "has been little to no preparation that I would view as anywhere approaching 'adequate' in terms of transition to adult life, vocational skill development, readiness for additional education, and/or independent living skills."

19.    Dr. Jensen concluded: "Given his long-term challenges and needs as well as these deficits in preparation toward adulthood, it is my professional opinion that JD is extremely unlikely to be successful in any type of employment or postsecondary education situation

and he is clearly without the skills to be able to live independently at this time." Dr. Jensen recommended: "Any remedy for these deficits will require a coordinated approach, likely involving an array of services and systems of assistance (minimally educational, vocational, psychological, and psychiatric), over an extended period of time.

20.    To summarize Melissa's and O.B.'s injuries as they attempt to reunite their household and secure necessary educational services for John Doe as a prerequisite to family reunification, John Doe is an incompetent adult yet the Defendants bar Melissa from filing for guardianship in Probate Court and the Defendants refuse to file for guardianship themselves.  John Doe is unable to make informed decisions about his education yet the Defendants bar John Doe from appointing Melissa under IDEA to assist him for that purpose.  Assuming John Doe is competent, John Doe wants to appoint Melissa his Power of Attorney yet the Defendants bar John Doe from making that appointment.  John Doe opposes remaining in the jurisdiction of Juvenile Court yet the Defendants unilaterally and summarily impose that loss of freedom on John Doe against his interest and Melissa's interest.  The Defendants have deprived John Doe of FAPE for years, continue to deprive John Doe of FAPE, and intend to exit him from his mandated educational entitlements and instead leave him in a position of extreme deprivation and need and risk.

### JURISDICTION AND VENUE

21.    This Court has jurisdiction pursuant to 28 U.S.C. 1331 and 1343.  The action arises under Section 504, the ADA, IDEA, and 42 U.S.C. 1983.  Venue is proper pursuant to 20 U.S.C. 1391(b) because Melissa and John Doe reside within the Southern District of Ohio,

Western Division, and the Defendants are responsible for their obligations within the Southern District of Ohio, Western Division.

## PARTIES

22.     Plaintiff Melissa Brown is the biological mother of 18-year old John Doe, a student with special needs, and John Doe's intended custodian.

23.     Plaintiff O.B. is John Doe's younger 16-year old brother and intended household member.

24.     Defendant Cincinnati Public Schools Board of Education is a public entity acting under color of law and responsible for the formulation and implementation of all official governmental laws, policies, regulations, and procedures for John Doe's education. CPS receives federal financial assistance within the meaning of 20 U.S.C. 1687.

25.     Defendant Lynchburg-Clay Local School District Board of Education is a public entity acting under color of law and responsible with CPS and under contract with CPS for implementing the educational planning and services for John Doe. Lynchburg receives federal financial assistance within the meaning of 20 U.S.C. 1687. This Verified Complaint may generally refer to CPS but that reference includes Lynchburg's related contractual obligations and its own deprivations of FAPE and discriminatory conduct.

26.     Defendant Hamilton County Jobs and Family Services is a local government agency that self-describes as "administers state, federal and local programs designed to help those in need and help families work toward self sufficiency." HCJFS placed John Doe with a treatment foster parent.

27.     Defendant Tamara Harrison is employed by HCJFS as John Doe's case manager and is most directly involved in the various deprivations and other unlawful conduct identified in this Complaint.

28.     Defendant Ohio Department of Education is an agency of the State of Ohio responsible for the implementation of the IDEA and for compliance with anti-discrimination laws.  ODE receives federal funding for the purpose of providing special education oversight and services to school age children with disabilities.  Within ODE is its Office for Exceptional Children ("OEC") which is responsible for ODE's compliance with IDEA, the Ohio Revised Code, and related implementing regulations.

29.     Defendant John Doe is an 18-year old individual with disabilities who has been deprived of FAPE by the Defendants, is Melissa's biological son and O.B.'s brother, is suffering ongoing irreparable injury, wants to reunite with his family, wants his mom involved in his education, wants to be the beneficiary of the outcomes for him intended by IDEA, and is a necessary party to this proceeding.

## STATEMENT OF FACTS

30.     Melissa, O.B., and John Doe intend to reunite as a family at the first reasonably feasible time, subject to John Doe receiving FAPE and to John Doe and the family receiving necessary individual and family support.  John Doe's younger brother O.B. is a high-achieving student in Cincinnati, Ohio, and similarly wants to reunite with John Doe as a family.

31.     John Doe's relationship with O.B. is and will be the longest-lasting relationship of John Doe's life.  It will exist for as long as John Doe is alive.   O.B. is able to have a sibling relationship with John Doe and each will benefit from that relationship.  O.B. is

able to serve as an ally, confidant, companion, and source of love for John Doe.  But for the Defendants' conduct, O.B. would currently be having an ongoing sibling relationship with John Doe that would benefit O.B. and benefit John Doe.

32.     HCJFS concedes that John Doe is developmentally disabled.  Yet HCJFS failed to continue essential services for John Doe from Hamilton County Developmental Disabilities Services ("HCDDS") even though John Doe received services at the highest level of eligibility, based on yearly assessed need, from HCDDS while Melissa had custody of John Doe.  As an example of how arbitrary and capricious and injurious government agencies have been to John Doe, HCJFS told HCDDS that John Doe *is* developmentally disabled and qualifies for services and HCDDS responded to HCJFS that John Doe does *not* qualify for services.  HCJFS chose to not appeal to finality HCDDS's erroneous conclusion.  After being contacted by this counsel, HCDDS said it would again evaluate John Doe for eligibility.  HCDDS once more denied John Doe eligibility, HCDDS is not involving Melissa in any way, HCJFS refused John Doe the opportunity to participate in a recommended private neuropsychological assessments scheduled for him at Cincinnati Children's Hospital Medical Center ("CCHMC").  Had HCJFS taken advantage of that opportunity to continue John Doe's private neuropsychological assessment in September 2019 all concerned would today have much unbiased essential information about John Doe.  HCJFS is again not appealing HCDDS's decision declining John Doe's eligibility for services as an individual with developmental disabilities.  Selectively choosing when John Doe is "competent" and when he is not, HCJFS states through its counsel:  "[John Doe] does not want to appeal this decision and his treatment team supports [John Doe]'s decision."

33.     On September 21, 2018, HCJFS and Defendant Harrison wrote to Melissa that "[HC]DDS will not step in until we emancipate.  You and [John Doe] received extensive services from DDS at one time, but my agency did not have custody then.  [John Doe] is telling us that after he turns 18 yo, he wants nothing to do with DDS . . . ."  HCJFS also stated at that time:  "We are only here to encourage him to allow us to guide him along the way."

34.     Continuing to provide Melissa irreconcilably conflicting messages, on September 24, 2018, Harrison wrote to Melissa:  "If [John Doe] decides to walk away from agency care when he turns 18, there is nothing I can do about that."

35.     One day HCJFS tells Melissa that John Doe is not incompetent but the next day HCJFS tells Melissa that the government intends to maintain custody and control of John Doe until age 21.  One day HCJFS tells Melissa that John Doe is developmentally disabled and the next day HCDDS tells Melissa that John Doe does not qualify for services.

36.     HCJFS maintains its control over John Doe by arguing that John Doe has a "mental or physical impairment or a combination of impairments . . . [that] manifested before age twenty-two . . . is likely to continue indefinitely . . . results in . . . a substantial functional limitation in at least three of the following areas of major life activity . . . self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living, and . . . capacity for economic self-sufficiency."  Even though HCJFS determined that John Doe has to remain in its custody until John Doe is 21-years old because he is developmentally disabled, and has deprived Melissa of the right to even procedurally seek guardianship of John Doe, HCDDS determined that John Doe does *not* qualify for services as an individual with developmental disabilities.

37.     Melissa has consistently informed HCJFS of her intent, O.B.'s intent, and John Doe's intent to reunite as a family.  For example, on August 21, 2018, Melissa wrote to Harrison:  "I want to be able to express clearly and strongly my love for him, and my need for him to stay the course, do the right thing and plan for a successful future together as an adult within our family."

38.     Even though John Doe is so impaired according to HCJFS that the government insists on maintaining custody until he turns 21-years old, and has blocked Melissa from all efforts to reunite the family, HCJFS is allowing John Doe to unilaterally make his own life-defining and destructive educational and health decisions.

39.     HCJFS also failed to secure medically necessary services for John Doe, including, but not limited to, in-home behavioral support services, from the Medicaid Early, Periodic, Screening, Diagnostic, and Treatment program ("EPSDT").  HCJFS has similarly failed to work with the Ohio Department of Mental Health and Addiction Services ("ODMHAS") to secure necessary services for John Doe.

40.     CPS, Lynchburg, and ODE admit that John Doe is a student with disabilities qualifying him for an IEP under federal and state law.

41.     John Doe has a long history of treatment for behavioral and emotional issues beginning when he was four-years old.

42.     John Doe was diagnosed as an infant with "Failure to Thrive."  He was diagnosed early in life with Early Onset Bi-Polar Disorder and diagnosed with Autism in 2007.

43.     As early as 2004, a CCHMC psychiatrist reported that three-year old John Doe continued "to have difficulty with impulsive behavior and aggression . . . . [John Doe] does have failure to thrive and is extremely small."

44.    In 2006, John Doe's kindergarten teacher stated that on the playground John Doe was physically aggressive and hit, kicked, and spit, and made hurtful statements.

45.    In 2006, HCJFS substantiated with regard to alleged abuse/neglect of John Doe by John Doe's father that "Credible evidence to confirm that child abuse/neglect occurred."

46.    CPS further reported in 2006 that "[John Doe] exhibits aggressive behavior during the course of his school day.  He pinches, hits, kicks, shakes, judo punches and screams uncontrollably at other children. He does this within the classroom and throughout the school building . . . . He also has thrown chairs and stomps in the room."

47.    In 2007, a CCHMC psychiatrist reported that John Doe "has a history of developmental delay, poor social skills, mood lability and anxiety symptoms.  He has been unable to attend school the last several months due to his aggressive behaviors. He was recently hospitalized because of his dangerous behavior . . . . He would most benefit at this time from services that are used for individuals with Autistic Spectrum Disorders."

48.    A 2010 occupational therapy assessment found that "[John Doe] presents with deficits that are currently impacting his . . . function and interaction within his . . . environment at home and school.  The deficits include sensory integration, self-help skills, attention and behavioral skills, fine motor, and visual motor skills."

49.    In 2011, a specialized private day school refused to accept John Doe as a student.

50.    A CCHMC psychiatrist concluded in 2011 that "[John Doe] is losing ground academically and possibly cognitively."  The psychiatrist added "He has a combination of challenges which include both mental health and developmental issues . . . . A combination of expressive language impairment, poor executive function and adaptive function in combination with his psychological difficulties and poor affect regulation put

him at extremely high risk and a highly structured environment was recommended . . . .

In the residential setting he did begin to take the first steps of progress.  These were tiny

steps that allowed him to decrease his violent behavior.  However, he was not allowed to

remain because of payment issues . . . . *It makes no sense to repeat interventions that have*

*not worked and are not really designed to meet his particular needs"* (emphasis added).

51.     In 2012, Melissa submitted to CPS a Consultation Team Report of John Doe

prepared by UMassMemorial.  Among other information, UMass Memorial provided:

> [John Doe] is a young man with a complicated neuropsychiatric history
> dating back to age three . . . . He is very aggressive towards his mother and
> his brother . . . and has been known to destroy property and express the wish
> to kill others.  He also is described as having a 'maniacal' laugh . . . . He
> also has had a decline in his cognitive performance . . . . [John Doe] is
> extremely complicated from a diagnostic perspective.  He has a genetic
> vulnerability for mood disorders and for primary psychotic disorders.  He
> presents with multiple domains of dysfunction including troubles with
> transitions, social pragmatic issues and with stereotypies as well as affective
> instability, executive dysfunction and significant auditory, visual and tactile
> hallucinations as well as delusions.  He more recently has been given a
> diagnosis of an autism spectrum disorder and a primary psychotic disorder
> is being considered . . . . In [John Doe]'s case, he presents with significant
> features of both disorders with domains of dysfunction that require both
> autism specific services and treatment for a primary psychotic disorder . . .
> . A major concern for planning for [John Doe] is the fact that [John Doe]'s
> aggression is at times very impulsive and dangerous and places him and
> others at risk of injury.

52.     UMass Memorial's first and primary recommendation for John Doe was placement

"*in a 24 hour, seven day/week full time residential school setting . . . . He requires*

*intensive behavioral supports . . . . 1-to-1 [specially trained] staffing across all settings .*

*. . . [O]ngoing behavioral services [with a Board Certified Behavioral Analyst, BCBA]"*

(emphasis added).  CPS rejected the UMass Memorial recommendation to place John Doe

in a specialized for autism 24-hour, seven day/week full-time residential school setting.

53.     A 2012 CCHMC neuropsychological assessment concluded that John Doe was borderline for verbal comprehension, extremely low for working memory and processing speed, and low average for perceptual reasoning.  The neuropsychologist indicated that John Doe's scores may have been lower than expected due to attention and behavior challenges but observed that "on the other hand, it provides realistic estimates of what [John Doe] is able to do given the reality of his behavioral problems."  CCHMC recommended periodic ongoing neuropsychological assessments for John Doe, *e.g.*, the assessment scheduled for September 2019 that HCJFS refused.

54.     In 2013, John Doe's IEP provided that "The severity of his behavior issues require [John Doe] to attend a special residential school."  Contrary to what his IEP provided, CPS did not place John Doe in a specialized residential school for students with his needs.

55.     Through other arrangements made by Hamilton County and for which CPS did not contribute, John Doe temporarily lived at a residential mental health treatment facility for some months in 2013. A lower level of care was ruled out for John Doe "due to [John Doe]'s unsafe behaviors at home and in the community.  [John Doe] has shown unsafe behaviors such as physical aggression, verbal aggression with specific threats to kill others . . . . John Doe is in need of a structured, secure, residential placement with a high staff to client ratio in order to stabilize his dangerous behaviors."  The facility later stated: "I believe that [John Doe] has improved since his arrival as far as academics as well as behavior and attitude."

56.     For many years, CPS failed to assess John Doe in all areas of suspected disability including autism. CPS knew, or should have known, that John Doe had autism and CPS should have provided educational planning, programming, and implementation consistent

19

with all John Doe's needs.  CPS acted with deliberate indifference and caused major permanent injuries to John Doe.  John Doe's claims for monetary damages toll during his years of minority and disability.  The Defendants have not informed John Doe that he has cognizable IDEA claims and non-IDEA claims for injunctive relief and for monetary damages against the Defendants and the Defendants bar Melissa from sharing that information with John Doe.  There are other matters in addition to Melissa's claims and O.B.'s claims in the case at bar that warrant equitable attention by the Court.

57.    Prior to February 2014, John Doe had ten separate inpatient psychiatric hospitalizations related to homicidal ideations, and three residential treatment placements at three different facilities.

58.    John Doe was prescribed psychotropic medications since age four for psychosis, aggression, and mood.

59.    A private 2014 mental health evaluation concluded:  "There are days when [John Doe] appears to display more symptoms of Autism Spectrum and there are days when he displays symptoms of Mood Disorder and Oppositional Defiant Disorder."

60.    In 2014, the private school Skyward Academy expelled John Doe due to disciplinary and violent behavior reasons.  The Director of Skyward Academy wrote that "his continued presence at Skyward would be a safety concern both for other students and for staff."

61.    In 2014, while admitted to the Cincinnati Children's Hospital Medical Center (CCHMC) inpatient program in psychiatry due to aggression, CCHMC's speech and language evaluation concluded that John Doe's articulation skills were severely deficient,

social-pragmatic language was severely deficient, receptive language was moderately deficient, expressive language was mildly deficient.

62.     John Doe's May 2014 ETR, the last ETR the Plaintiffs possess, states:

> [John Doe] wants to be the center of attention and will act out in order to have the focus of the group and adults be centered around him. [John Doe] is also often very verbal in voicing his opinions of other students, staff, and situations, and these opinions are never positive. [John Doe] will make disparaging comments such as "this sucks," "you are a retard," etc. . . . We have pages of write-ups from behavior situations from the past several months. [John Doe]'s behaviors escalated to the point where he swung a hockey stick at a teacher, hit and punched a teacher, sprayed a spray bottle of Clorox in a teacher's face, and had to be physically restrained on more than one occasion . . . . [John Doe] needs to be in a closely monitored, highly structured environment. He misses out on much academic learning due to his inability to focus and maintain appropriate behaviors in a group setting. [John Doe] needs to be in an environment which will protect himself and others from injury during his explosions.

63.     The 2014 ETR concluded: "[John Doe] met the criteria for an identification of autism [in] all four areas assessed [Qualitative Abnormalities in Reciprocal Social Interaction; Qualitative Abnormalities in Communication; Restricted, Repetitive, and Stereotyped Patterns of Behavior; and Abnormality of Development Evident at or before 36 Months]."

64.     In 2014, Envision, a private provider contracted through HCDDS, stated that "a majority of [John Doe]'s success is due to his mother and sibling learning and mastering the suggested strategies. It was/is their ability to consistently apply the strategies that create a safe and supportive home environment and allow [John Doe]'s neurological pathways to form."

65.     CPS reported that "Since January 2015, [John Doe] has had multiple issues related to school behavior that although may have a sensory based component to the behaviors, he refuses to participate in calming strategies provided by the teacher and aide. When

these strategies have attempted to be imposed upon him, he has a negative response which in turn escalates the behaviors.  He has been removed from Riverview and placed on alternative placement within CPS on several occasions due to profanity, violent misconduct, and sending threatening messages to peers."

66.    A 2015 private psychoeducational assessment of John Doe concluded that John Doe's ability to concentrate was in the very low range.  His intelligence measure was borderline range. The components of the intelligence measure were processing speed (very low range), working memory (borderline range), verbal comprehension (borderline range), visual-spatial reasoning and fluid reasoning (low average range).

67.    Another private evaluation in 2015 concluded:  "[John Doe] clearly is an at-risk child . . . . [John Doe] seems to present an ongoing danger of harming others and himself . . . . *However, it is strongly recommended that [John Doe] have ongoing contact with his family* unless there is a compelling reason for discontinuing such contact . . . . He has demonstrated the cognitive ability to benefit from occupational and vocational training" (emphasis added).

68.    In 2015, a professional familiar with John Doe's trauma history reported about his behavioral and emotional disturbances:

> Such behaviors include aggression, psychomotor agitation and explosive irritability which can last longer than a week.  John Doe has poor social boundaries and socially disruptive behaviors.  John Doe has a history of making sexual comments and drawings and inappropriate touching of others . . . . Socially, John Doe struggles to show empathy toward others and he becomes frustrated when peers will not play the way he wants them to.  John Doe will not show remorse when he physically or emotionally hurts others and he struggles with situations that require attention, weighing of options and planning . . . . It bears notice that John Doe has experienced several different traumas throughout his life . . . . Most importantly in this case, self regulation, mood stability, frustration, tolerance, impulse control,

patience, and delay gratification are affected . . . . John Doe has an extensive trauma history beginning at age three.

69.     In May 2015, HCJFS told Melissa that the agency did not have the ability to make a residential placement recommendation for John Doe but did *not* explain to Melissa that CPS did have the obligation to properly assess John Doe in all areas of suspected disability and to recommend a specialized residential school placement for John Doe.

70.     On July 8, 2015, John Doe threatened other children in his foster placement at the time with a metal fireplace poker.  Law enforcement was called to respond.   ProKids informed Melissa:  "[John Doe] was transported to Children's Hospital, where he will be admitted . . . . [John Doe] brought his bunny with him to Children's."

71.     On July 29, 2015, ProKids wrote to Melissa:  *"You are, and always will be, [John Doe]'s mother . . . . Per JFS, you are able to have daily phone contact with [John Doe], as well as visit him weekly . . . . As far as information about treatment planning . . . I believe you are able to have access to this information*" (emphasis added).

72.     In October 2015, a CCHMC psychologist wrote "[John Doe]'s mental illness has produced a truly toxic environment for those around him due to his extreme impulsivity, verbal and physical abusiveness toward nearly everyone who knows him, and his recent escalation of these behaviors to the point of being placed in foster care as he was deemed a danger to O.B. and [Melissa] . . . . We have previously discussed the decision of a residential placement for [John Doe] to meet his needs as this was previously demonstrated."

73.     On March 21, 2016, while John Doe was in temporary custody of HCJFS, Hamilton County Juvenile Court issued an order providing:

> Mother has been very involved with John Doe during the time he has been at Adriel . . . . [John Doe]'s mental health and lack of impulse control warrant constant supervision . . . . [John Doe] is restrained 1 to 2 times weekly.  [John Doe] has a physical developmental deficiency . . . . [John Doe] has a history of getting sexually abused . . . . [John Doe] gets bullied. Sometimes, [John Doe] joins in with the bad behavior of others.

74.    In April 2016, Melissa wrote to Hamilton County officials, ProKids, and others, after receiving notice that HCJFS intended to seek permanent custody of John Doe: "Please let me be clear, I will not agree to being removed from [John Doe]'s life in any way.  I do not know what my options are, but I will find a way.  My son does not need to be adopted as is proposed in the letter, he needs full-time medical care and a trained one-on-one caregiver . . . . *This is not right to ask a mother to sever her ties to her son in order to keep her other son safe . . . . I am imploring you, please do not separate my son from me.  He has a family, a mother, a brother, extended family who loves him.  He needs us and we need and want him.  Please help me find another way*" (emphasis added).

75.    HCJFS and CPS ignored John Doe's education needs and placed him in a regular classroom in a regular high school.  John Doe was then removed from that regular high school and placed in a day school operated by the Clermont County Educational Service Center ("CCESC").  The Defendants never placed John Doe in a 24-hour/day, seven-day/week specialized residential school for students with autism and John Doe's other needs.  Recently, in order to expedite John Doe's removal from CPS, the Defendants transferred John Doe back to the regular high school for very limited and isolated hours and highly restricted services.

76.    For years, CPS and Lynchburg have failed to assess John Doe in all areas of suspected disability in violation of their obligations under IDEA. Upon information and belief, in 2017 CPS and Lynchburg prepared an ETR for John Doe without first assessing

John Doe in all areas of suspected disability.  Without an accurate ETR it is impossible to develop an appropriate IEP for a student with disabilities.  In fact, CPS and Lynchburg did not provide John Doe an appropriate IEP and did not provide John Doe FAPE.  None of the Defendants has informed John Doe of his rights to FAPE and his rights to compensatory education services allowing him to progress in all domains to the levels he would have progressed had CPS and Lynchburg provided FAPE to John Doe.  John Doe told Melissa on November 8, 2019, that he is uninformed about the IDEA and FAPE rights that are supposed to pass to a student who reaches majority at the age of 18.

77.    In 2017, Harrison wrote to Melissa: "We can intensify therapy, but by doing so, his level would increase and he would most likely be placed in residential . . . . Have you thought about taking custody back of [John Doe]?"  Harrison added:  "It seems as if his behaviors are getting worse and he takes no responsibility."

78.    Up until November, 2018, HCJFS informed Melissa that CPS and Lynchburg were going to educate John Doe using an IEP until age 22.

79.    Late in 2018, HCJFS informed Melissa that it had changed its opinion and that it was going to exit John Doe from CPS and Lynchburg in 2019 when he was 18-years old and just a junior in high school.

80.    John Doe is not competent to make life-defining educational decisions on his own behalf.

81.    Based on her own personal observation of John Doe's entire life as his biological mother, Melissa states that to the best of her knowledge and belief John Doe's current functional, behavioral, and academic needs continue to include all those needs identified in private independent assessments of John Doe when he was younger.  Those include,

25

but are not limited to, an environment that allows movement, choices, highly qualified educators with a foundation of positive and creative behavioral supports and rewards, experiential opportunities to learn, simple written instructions to accommodate John Doe's significant receptive language challenges, trauma-appropriate educational services.

82.     CPS has never offered John Doe the opportunity to attend a specialized residential school designed to serve students with his autism and other needs.  IDEA requires an IEP placement that will allow a student to progress in all domains but CPS and Lynchburg never provided John Doe an appropriate IEP placement.

83.     CPS has conferred passing grades on John Doe even though he did not understand the material, did not do homework, and refused to take examinations.  The 2019 ODE Findings Letters concluded that John Doe did not meet the State of Ohio level of proficiency in the subject areas for which he was tested for the school year 2017-18.  John Doe placed significantly below required standards in the core curriculum.

84.     John Doe's foster parent believes that he will be in and out of the justice system his whole life.  The local police department where the foster parent lives has the same belief. John Doe has not made behavioral progress while educated by CPS and Lynchburg or while in HCJFS custody.

85.     In October 2016, John Doe's foster parent communicated to Melissa and others:

> [John Doe] has been struggling with starting arguments with the other kids . . . . [John Doe] was talking dirty to this girl on the bus, and calling her some pretty bad names, and also ask[ed] her to give him head . . . . [John Doe] sent out a picture of a male genitals to some girl at school . . . . [John Doe] "spit" on [another boy] . . . [At church] he then began kicking the backs of chairs where people were sitting . . . . I found him [in the park] smoking . . . .

86.     In November 2016, the foster parent wrote:

[John Doe] ran away Sunday night and was gone until about noon time on Monday . . . . He has been picking at the kids at home . . . . He starts by telling me I am a liar, that he hates it at the house, that I can't make him do anything, that he is the boss, and then laughs at the things he says, he is very disrespectful.  Also is having behavior problems at school, he had Saturday school this past Saturday, detention after school today, he has detention Thursday, and next Tuesday, he has been tardy for class, disrespectful to teacher, acting out in classroom instead of doing his work, not listening to direction.

87.    In December 2016, John Doe's foster parent told Melissa and others:

Let's see, where do I start.  [John Doe] lied to me . . . . [John Doe] got angry tonight at the dinner table, well it turned into an all out blow up on [John Doe]'s part before I could even stop him, he began to call me a "fucking bitch," told me to "suck his dick," and to "go get fucked."   He also went out into the garage and kicked over chairs, and threw them, also kicked over one of the other boys' big speaker, he was screaming, hollering . . . . His behaviors have been out of control, at school, and home . . . .

88.    In May 2018, HCJFS informed Melissa about John Doe:  "He was cussing at staff and threw a chair down so hard that it broke."

89.    In September 2018, John Doe ridiculed black and Hispanic people.  He told another student they were his slaves.  John Doe was suspended from school in September 2018.  John Doe has engaged in hurtful racist and sexual behaviors since he was very young.

90.    In September 2018, John Doe engaged in public inappropriate sexual conduct.  When told to stop he responded that "it was his, he could do whatever."

91.    In September 2018, and frequently before and since, John Doe "cussed out" his foster parent.  He also leaves the foster home without permission.

92.    In November 2018 John Doe wrote to Harrison and HCJFS and others:  "I took a practice GED Test . . . but I got to the fourth question and I had to quit on the math exam . . . . I wanna stay in high school until I am more fluent in all High School Subjects . . . . I don't know what I want to do after I graduate . . . . I need your help!  I asked Ms. Bose at

27

the beginning of the year for an IEP meeting when she told me the plan was for me to graduate early and I never got one. I was pretty upset and disappointed that I didn't get one since then . . . . They recently on November 6, had a meeting but I wasn't aloud [sic] to attend even though I asked them before this meeting. The plan that was made is not what I want."

93. In December 2018, John Doe violated additional rules including, but not limited to, watching pornography.

94. On top of what she discerned herself following the sudden decision by CPS to exit John Doe early from his education in his junior year, in 2019 Melissa filed her ODE State Complaints against CPS. On January 22, 2019, Melissa filed State Complaints with the Ohio Department of Education bringing to ODE's attention that CPS had been depriving John Doe of FAPE. ODE is ultimately responsible under IDEA for the provision of FAPE to John Doe when his school districts fail to do so.

95. While in foster care, John Doe was shot with a BB gun and suffered injuries requiring medical care, he defecated on a car, publicly urinated multiple times, and was arrested by law enforcement on several occasions, placed in solitary confinement, and charged with theft and burglary on different occasions.

96. In October 2018, and before it retaliated against Melissa because she advocated for John Doe, HCJFS informed Melissa that it was "willing to work toward the plan *that you and [John Doe] think would be in his best interest* once he reaches the age of majority" (emphasis added). Defendant Harrison wrote to Melissa on October 31, 2018, that "*We will be advocating for him to stay in school until he turns 22"* (emphasis added).

97.    At a meeting on November 30, 2018, between Melissa, Defendant Harrison, and two "co-appointed" representatives from ProKids, HCJFS and ProKids misleadingly informed Melissa that at age 18 John Doe would make his own decisions, including leaving high school if he chose, and that HCJFS could not require John Doe to maintain his educational rights with CPS.  Melissa assumed that these officials were correct when they told her John Doe would be competent to make his own educational decisions but they were wrong.  ProKids stated:  "I think we're all in agreement that he's not ready for life.  I mean we are aware of that."

98.    At the meeting, Defendant Harrison said to Melissa that Melissa was to blame for putting John Doe into foster care and that HCJFS never should have received permanent custody of John Doe.   Harrison emphasized: "Oh, and I very much mean that."  She added:  "You really don't want to know how I feel."  To share her opinion of Melissa, Harrison was unmistakably clear:  "[John Doe] is the victim here . . . . I think that [John Doe] does have mental health issues.  I think [John Doe] does have medical issues.  I think [John Doe] is traumatized over and over again every time he has to come face-to-face with you and have a conversation because he realizes he's not in your home."

99.    Harrison, a government official, was gratuitously and erroneously hurtful to Melissa:  "You should have been able to maintain him in your home.  I feel that way."  Harrison abusively imposed on Melissa:  "Is there a mental health issue with you?"  Harrison's conduct toward Melissa was callously indifferent within the meaning of the law authorizing an award of punitive damages.

100.   At the November 30, 2018, meeting, ProKids told Melissa "[Y]ou are [John Doe]'s mother and he'll be with you when we're long gone."  At the meeting, ProKids expressed

to Melissa that "nobody questions your love for [John Doe]. That's why you're here and that's why we want to make you part of the team because you love him . . . . [W]hen he's 30 years old, you're gonna be . . . with him." ProKids said to Melissa "You just want the best for him and I think he doesn't want to disappoint you." ProKids nevertheless told Melissa that if she did not go along with HCJFS they could stop her phone calls and visits with John Doe.

101.    Melissa communicated to HCJFS and ProKids that "[John Doe] hasn't gotten the transition services or resources or has seen a college or a vocational program or anything that he should have." She was clear: "It should be in his IEP. . . it's a huge transition section in the IEP." Melissa reminded ProKids that John Doe had asked for copies of his IEP and had asked to attend IEP team meetings

102.    The fact that Melissa wants CPS to be accountable for depriving John Doe of FAPE and wants to secure appropriate ongoing and compensatory educational services for John Doe has placed her in opposition to the Defendants and ProKids who are willing to give CPS a pass on the school district's legal obligations to John Doe.

103.    ProKids admitted at the November 30, 2018, meeting that John Doe "can't do anything unless he gets his behavior under control. So that to me the academics is secondary to getting his, you know, because he can't go to college if he can't stay in class all day. Or vocational school or anything." ProKids stated that John Doe's "behavior has prevented him from working."

104.    Melissa stated at the November 30, 2018, meeting: "I likely will have financial and health guardianship of him."

105. Melissa told ProKids what John Doe does every day in foster care: "[John Doe] literally from the time he gets home from school until the time he goes to bed at night is gaming with people from across the country on killing shooting games. And this is a kid who has expressed violent thoughts since he was 3-4 years old. I just don't think it's a good idea." ProKids added that "he's also watched some inappropriate things on Netflix."

106. In February 2019, the foster parent asked Melissa: "Please talk to John Doe about being disrespectful, because he has really been bad."

107. On March 12, 2019, Melissa, O.B., and John Doe had a very positive birthday celebration for Melissa.

108. On March 19, 2019, during a regularly scheduled phone call with Melissa, John Doe shared with Melissa that he had had a bad day at school and that the school principal told John Doe he would be going to adult jail the next day. Melissa informed John Doe that he needed to contact Disability Rights Ohio ("DRO") for assistance and shared with him how to seek that assistance. John Doe was frightened and upset at the information provided to him by the school principal and the threat of adult jail.

109. On March 22, 2019, Melissa informed DRO that John Doe wanted to discuss guardianship and wanted to better understand his rights as an individual with disabilities. Melissa asked that DRO contact John Doe to begin to assist him.

110. When Defendant Harrison learned that Melissa had contacted DRO Harrison retaliated against Melissa by limiting Melissa's ability to communicate with John Doe and visit him.

111.   In April 2019, the foster parent told Melissa "I'm sorry things are the way they are . . . . [John Doe] is asking about you guys visits.  As soon as I hear something I will let you know.  Sorry."

112.   In July 2019, the foster parent wrote to Melissa:  "He says he loves you . . . ."

113.   Nevertheless, Harrison recently said to Melissa:  "Your visits with [John Doe] have always been at the discretion of the agency and the GAL and based on our perception of what was in [John Doe]'s best interest."  Harrison pretextually asserted to Melissa:  "Visits were stopped after [John Doe] had an intense negative emotional reaction to your last visit.  We believe time has passed and know [John Doe] wants to visit with you again."  Harrison developed this visitation ban in response to Melissa filing her State Complaints with ODE, attempt to file a complaint with the Ohio Department of Jobs and Family Services against Harrison and HCJFS, and attempt to secure DRO assistance for John Doe.  Furthermore, Harrison's ban of John Doe's visits with Melissa based on his emotional experience were a violation of the standards and guidelines governing HCJFS's treatment foster care for John Doe.  O.A.C. 5101:2-7-09(E)(7).  By comparison, in 2016, Harrison openly approved unsupervised visits between John Doe and Melissa, for example:  "I am fine with you visiting with [John Doe] while he is at the respite provider."  Upon information and belief, and as expressed by John Doe, Melissa asserts that John Doe has never requested any limitation on his visits with Melissa and O.B.

114.   On February 19, 2019, the vocational rehabilitation counselor at the Opportunities for Ohioans with Disabilities ("OOD") determined that John Doe had "serious limit[ations] in the Functional Capacity Areas of communication, self-direction, and interpersonal skills."

115. John Doe's functional, behavioral, and academic needs are varied and significant yet his current IEP only provides him skeletal services.

116. John Doe is very unprepared for future education, employment, and independent living as required by IDEA. CPS, Lynchburg, and HCJFS turned on a dime by first telling Melissa they intended to provide FAPE to John Doe until age 22 and then, without sufficient justification, instead now plan to exit John Doe from his IDEA education as soon as they can provide him a minimal noncompliant diploma.

117. Ohio law bars Melissa from having access to Juvenile Court to seek authority over, or even participation in, John Doe's educational welfare. HCJFS and Juvenile Court personnel have not permitted Melissa to appear in Juvenile Court and directly request reunification with John Doe. Upon information and belief, John Doe requested reunification with Melissa and O.B. but his request was denied.

118. Ohio law bars Melissa from having access to Probate Court to seek guardianship over John Doe.

119. HCJFS bars ODE from providing to Melissa records related to ODE's resolution of Melissa's State Complaint and proof of sufficient and necessary services for John Doe.

120. A magistrate judge in Probate Court directly informed Melissa that Probate Court does not have jurisdiction to hear Melissa's desired guardianship petition for John Doe because Juvenile Court has jurisdiction over John Doe.

121. HCJFS has barred John Doe from providing Melissa power of attorney over educational decision-making. John Doe is 18-years old and wants Melissa to have power of attorney over educational decision-making and/or wants Melissa to be his guardian.

Melissa wants power of attorney over educational decision-making and/or wants to be John Doe's guardian.

122. John Doe is incapable of taking proper care of himself or his property. Nevertheless, HCJFS has not acted to have John Doe adjudicated "incompetent" and additionally bars Melissa from filing in Probate Court to have John Doe adjudicated incompetent.

123. One of ODE's procedures available for resolving disputes is "the state complaint process" invoked by Melissa and required by 20 U.S.C. 1415(b)(6). If ODE finds deprivations of FAPE or other violations then ODE has to assure proper corrective action. ODE may withhold funds from a school district and is required to use IDEA and other funds to directly provide FAPE to a student when a school district itself fails to provide FAPE.

124. This Court may order that ODE provide direct services to John Doe when his school districts are unwilling to do so. *Honig v. Doe*, 484 U.S. 305, 328-29 (1988).

125. ODE is required to have a means of "effective implementation" of its State Complaint findings. 34 C.F.R. 300.152(b)(2).

126. In a civil action brought under the IDEA seeking equitable relief a court "*shall grant relief as the court determines is appropriate*." 20 U.S.C. 1415(i)(2)(C)(iii) (emphasis added).

127. Courts have interpreted the language, structure, and legislative history of the IDEA to permit ODE to hold CPS and Lynchburg financially responsible when they fail to provide FAPE to a student with disabilities. ODE must step in when CPS and Lynchburg cannot or will not provide a student with a FAPE.

128.   By Findings Letters dated March 19, 2019, and April 22, 2019, ODE found that CPS had difficulty securing a transition placement for John Doe due to his behaviors; the entities responsible for John Doe's education were unable to find a vocational program for him because he had a one-on-one aide with him throughout the school day; CPS was unable to determine what John Doe desired regarding employability; John Doe had no onsite visits for different types of jobs or vocational placements.   ODE concluded that CPS violated 34 C.F.R. 300.17 [free appropriate public education]; 34 C.F.R. 323(a) [when IEPs must be in effect]; 34 C.F.R. 300.320 [transition services]; and O.A.C. 3301-51-07(H)(2) [transition services].

129.   ODE was emphatic about CPS's violations:  "Here, there is no evidence that any of the Student's transition services were made based on any type of assessments related to training, integrated employment, or independent living skills."  CPS failed to develop a proper IEP and claimed it could not implement proper transition goals for John Doe "due to the Student's behavioral issues.  These issues place the District in violation with this section."

130.   ODE found that CPS was in violation of 34 C.F.R. 300.324 [development, review and revision of individualized education program].  ODE held that CPS did not properly consider John Doe's academic, developmental, or functional needs.  ODE found that John Doe had, in fact, *regressed* while in CPS's authority.

131.   ODE found that CPS violated 34 C.F.R. 300.322(b)(2) [parent participation] by not providing adequate notice prior to IEP team meetings and not providing adequate documentation after the meetings.

132.   ODE found that CPS violated 34 C.F.R. 300.503 [prior notice by the public agency; content of notice].

133.   ODE found that John Doe "was removed from the classroom 39 times and was moved to a separate part of the classroom three times."

134.   ODE found that John Doe was suspended from school in September 2018 for two days and in January and February 2019 for a combined five days.  That is the most recent information Plaintiffs possess about John Doe's out-of-school suspensions.  He also had several in-school suspensions during those few months.

135.   ODE found that John Doe had 71 "Write Ups" or negative behavioral incidence reports from March 2018 until February 2019.  The recorded behaviors included with high intensity of occurrence:  yelling, screaming, or swearing; verbal disrespect toward adults; refusal to follow directions; attempted or actual property damage; inappropriate sexual gesturing or language; verbal disrespect towards peers; suicidal or homicidal statements.

136.   ODE found that CPS violated 34 C.F.R. 300.324(a)(2)(i) [development, review, and revision of IEP—consideration of special factors].  ODE concluded that CPS violated federal law by only making minimal changes to John Doe's behavioral goal and services in his IEP even though he had been regressing.

137.   ODE found that CPS violated 34 C.F.R. 300.305(a)(2)(iv) [additional requirements for evaluations and reevaluations].  ODE concluded that CPS failed to make proper additions or modifications to John Doe's special education and related services so he would be able to meet the behavioral goals in his IEP.

138.   ODE found that CPS violated 34 C.F.R.300.503 [prior notice by the public agency; content of notice] by using identical notices for consecutive annual IEP team meetings and failing to identify changes.

139.   CPS failed to provide John Doe certain sciences, foreign language, extracurricular activities, social skills development, and failed to comply with various procedural and substantive requirements necessary for FAPE.

140.   ODE has refused to provide Plaintiffs the data and information CPS provided to ODE to demonstrate CPS's purported compliance with ODE's orders against CPS.

141.   CPS stated in John Doe's IEP that "the nature and intensity/severity of the student's disability is so significant that direct [specially designed instruction] in social and emotional skills by trained staff in behavior management, behavior de-escalation, and behavior processing is required.  Even with the use of supplementary services, the student cannot be appropriately served in the regular education environment with the same age and grade level typical peers."

142.   ODE found that CPS did not provide any documentation regarding whether it provided John Doe a functional behavioral assessment (FBA) or a behavior intervention plan (BIP).   Upon information and belief, CPS and Lynchburg violated 34 C.F.R. 300.17 and 34 C.F.R. 300.320 by either not developing any BIP for John Doe or by developing a plainly insufficient and inappropriate BIP.  The school districts did not properly address John Doe's behavioral needs either directly or through a BIP.  Therefore, the school districts violated IDEA and deprived John Doe of his entitlement to FAPE, his ability to safely live with Melissa and O.B., and deprived Melissa and O.B. of their entitlement to live safely with John Doe.

143.   ODE reported that John Doe scored below State of Ohio standards on Ohio's State Proficiency Tests.

144.   CPS and Lynchburg have not provided John Doe an appropriate IEP with accurate present levels of performance in all domains; with all necessary specially designed instruction, related services, accommodations, and modifications; with an appropriate BIP; with necessary transition planning and services; and with an appropriate specialized residential school placement.

145.   CPS and Lynchburg failed to take meaningful steps to ascertain John Doe's transition-related preferences.  Ignoring a student's transition-related preferences not only demeans the individual whose future is likely to be shaped by transition planning, it also reduces the likelihood that the IEP team will design an optimal transition program for a child with disabilities.  *Gibson v. Forest Hills Local School District Board of Education*, 655 F.App'x 423 (6th Cir. 2016) ("*Gibson*").

146.   CPS and Lynchburg were required to take steps to ensure that John Doe's post-secondary preferences and interests are considered.  *Gibson*, *supra*.  The school districts were required to timely conduct formal transition assessments and expose John Doe to sufficient job-related activities.  The school districts failed to do so and that failure meant that they did not properly apprise John Doe's IEP team of his transition-related preferences and interests.  Consequently, the IEP team did not ensure that John Doe's preferences and interests were considered when devising his IEP.  34 C.F.R. 300. 321(b)(2); O.A.C. 3301-51-07(l)(2)(b).  *Gibson, supra*.

147.   Nor did the school districts provide John Doe with mandatory measurable post-secondary goals based on age-appropriate transition assessments.  IDEA requires that

John Doe's IEP "must" include appropriate measurable post-secondary goals in areas such as training, education, and employment and those post-secondary goals must be based on age-appropriate transition assessments of the child's current and future capabilities. *Gibson, supra*. IDEA also requires that the IEP team list the services that the school districts will provide to help the child accomplish those goals. Ohio law adopts this basic federal framework and adds that the age-appropriate transition assessments must not simply related to employment, but rather "employment in a competitive environment in which workers are integrated regardless of disability." O.R.C. 3323.011(H)((2). All these requirements are mandatory. *Gibson, supra*. Upon information and belief, the school districts ignored these transition requirements since John Doe was 14-years old. They did not provide John Doe the appropriate mandatory assessments and services required by IDEA.

148. The school districts were required to focus on John Doe's longer-term transition needs and not just short-term development. *Gibson, supra*. Upon information and belief, they did not. Whatever, if any, long-term transition goals the school districts included in John Doe's IEPs they were not "truly measurable." *Gibson, supra*.

149. All of the school districts' transition-related failures resulted in a loss of educational opportunity that denied John Doe a FAPE. *Gibson, supra*. John Doe could have, and would have, taken advantage of lawful post-secondary transition planning. John Doe has always expressed an interest in attending college but is not currently able to attend college and is unaware he does not qualify for admission even though he believes he is eligible for admission now.

150.    Upon information and belief, CPS and Lynchburg have not provided John Doe appropriate IEP transition goals, vocational goals, and independent living skills goals.

151.    HCJFS has failed to secure necessary HCDDS services for John Doe that include, as HCDDS itself describes on its website:  Support from agency staff who work in collaboration with public schools including, but not limited to, its Itinerant Support Team; transition consultants who work with students, families, teachers, and other members of the IEP team to develop personalized transition plans based on the student's preferences, interests, needs, and strengths; experiential learning to develop life skills that enable a student to achieve post-secondary goals and make connections to community agencies and/or services.  Upon information and belief, the Defendants failed or refused to secure HCDDS transition services for John Doe.   Upon information and belief, HCDDS itself, without proper planning, improperly and unlawfully exited John Doe from the agency's transition and other services including, but not limited to, the services HCDDS coordinates with school districts for students with IEPs.

152.    John Doe told ODE and documented in the ODE March 19, 2019, Findings Letter against CPS:

> The Student recalled filling out a questionnaire in a group of other students about his career interests, but the questionnaires were never discussed as a group or individually, and once they were completed, the Student never saw the survey again.  The Student was unable to specifically recall what questions were asked in the questionnaire.
> *      *      *      *      *
> The Student would like "more help" in terms of job training and searching for employment.

153.    Based on information and belief, Melissa and O.B. allege that ODE has not verified that CPS is providing FAPE to John Doe or compensatory services sufficient to allow him to develop in all domains to levels he would have developed had CPS provided FAPE in

the first instance. Based on information and belief, ODE has not attempted to compel compliance by CPS, has not set effective deadlines for FAPE and adequate compensatory education services, has not threatened to withhold funding from CPS, and has not withheld funding from CPS. All the while, John Doe's life and future are undermined creating real risks to himself and others.

154.    John Doe's intellectual and behavioral disabilities are so severe that John Doe is incompetent to make appropriate educational and independent living decisions on his own.

155.    Prior to their retaliatory conduct against Melissa barring her visitation with John Doe and her phone calls with John Doe, HCJFS and Harrison had a "case plan" allowing John Doe to visit Melissa for eight hours per month plus access on the phone. That all stopped when HCJFS and Harrison began retaliating.

156.    HCJFS and Harrison refuse to provide Melissa accurate information about John Doe's education achievement in all domains.

157.    CPS and Lynchburg refuse to provide Melissa accurate information about John Doe's education achievement in all domains.

158.    ODE refuses to provide Melissa accurate information about John Doe's education achievement in all domains.

159.    HCJFS and Harrison have instructed John Doe's foster parent to refuse to provide Melissa current information about John Doe's education status. The foster parent has offered to provide information to Melissa if HCJFS would allow her to do that.

160.    CPS refuses to allow Melissa to speak with the "surrogate parent" CPS appointed for John Doe about John Doe's education status.

161. John Doe's guardian ad litem refuses to provide current information about John Doe's education to Melissa. John Doe's CASA refuses to provide current information about John Doe's education to Melissa.

162. Melissa has informed ODE that John Doe is still not receiving FAPE and is still not receiving compensatory education services sufficient to allow John Doe to develop in all domains to the levels he would have developed had CPS provided FAPE in the first place. Upon information and belief, ODE knowingly refuses to remedy those deficiencies.

163. ODE does not have procedures for complying with the mandatory requirements of 20 U.S.C. 1415(m)(2) and did not comply with the federal law. CPS does not have procedures for complying with the mandatory requirements of 20 U.S.C. 1415(m)(2) and did not comply with the federal law. This noncompliance further causes Melissa and John Doe to be unable to work together for his welfare.

164. On May 2-3, 2019, Harrison informed Melissa that for a visit "Helen and I can bring [John Doe] to meet you for an hour supervised lunch or breakfast possibly in Hillsboro. We will let you know when we determine a day." Melissa inquired of Harrison's reason for that decision. Harrison pretextually responded: "This is simply to protect all parties from any miscommunication." What Harrison meant by her comment is that Harrison did not want Melissa informing John Doe of his right to assistance from DRO.

165. In June 2019, Melissa wrote to HCJFS and others: "I am asking again. I am begging you . . . . I am asking again to be that person [with an active parental role and advocate in school] (he has shared with me that he wants this too.)."

166.   In June 2019, HCJFS contradicted itself and responded to Melissa:  "I have consistently stated in every communication that we as a team believe it to be in [John Doe]'s best interest to remain in custody until we believe he is prepared for successful emancipation."

167.   In July 2019, John Doe asked to be reunited with Melissa but his request was denied. Upon information and belief, HCJFS does not want additional third parties to learn that it has utterly failed as John Doe's custodian to secure him FAPE, and many other services and entitlements, and John Doe therefore remains in acute need and at great risk.

168.   Disregarding John Doe's inability to competently and safely make these life decisions for himself, Defendant Harrison told Melissa on October 3, 2019:  "[John Doe] very much wants to graduate this school year whether you agree or not."

169.   The agency mandated by HCJFS to monitor Melissa's October 4, 2019, visit with John Doe (the first visit HCJFS allowed in months) informed Melissa that the agency had never had to monitor a meeting between a child and mother where there had been no abuse or neglect.  At the meeting, John Doe informed Melissa that he does not have a job coach and that he does not have access to a computer.  John Doe said he had not been informed of the availability of a school-based guidance counselor.  He is not permitted to withdraw books from a public library.  John Doe told Melissa that he is not permitted to participate in extracurricular photography at school.

170.   At the October 4, 2019, visit John Doe told Melissa he plans to live in her household.

171.   Recently, the Hamilton County Prosecutor's office admitted:

John Doe currently remains under Juvenile Court jurisdiction.  Juvenile Court can maintain jurisdiction over an individual until age 21 if the

individual is still in school or is developmentally disabled.  Right now John Doe is still in high school with a projected graduation in December 2019. As you probably know, John Doe has multiple mental health diagnosis [sic], behavioral issues and cognitive limitations . . . . John Doe has been in a foster home since July 2016.  Overall, his foster mother has managed him well despite John Doe's continuing defiance, destruction of property and going AWOL.  He has had a number of delinquency charges in Juvenile Court and he struggles in school.  He has not progressed beyond a full time one on one aide in school.

172.   The Hamilton County Prosecutor's office continued:  "Because you [Melissa] are not a party to the continuing Juvenile Court proceeding, I have no authority to release court orders to you.  Should the Probate Court ask HCJFS for such orders, HCJFS will provide them to the court." However, Probate Court refuses Melissa access to Probate Court because of the continuing Juvenile Court proceeding (even though John Doe is 18-years old) and Juvenile Court will not allow Melissa to make an appearance as a party before it.  Nevertheless, the Prosecutor's office informed Melissa in July 2019:  "One concern [John Doe] had was to see you."

173.   Upon information and belief, the Defendants have contrived Ohio high school graduation requirements for John Doe in order to exit him early from its educational and other obligations to him.  In fact, John Doe has not properly met Ohio high school graduation requirements.

174.   Upon information and belief, HCJFS has never informed Juvenile Court that ODE issued Findings Letters adverse to CPS and that ODE concluded that CPS had deprived John Doe of FAPE.

175.   CPS has unlawfully followed the orders of HCJFS with regard to John Doe's education and the CPS General Counsel recently stated:  "Unless JFS consents to [John

Doe]'s mom having a role in making educational decisions about [John Doe]'s future, I do not think I can recommend that CPS folks meet with her."

176.    HCJFS usurped the authority IDEA delegates to John Doe's IEP team.   In November 2018, HCJFS told Melissa:   "[John Doe's HCJFS] team would like him to receive his diploma verses [sic] not receive it.  After [John Doe] turns 18 yo, we cannot force him to attend school."  Even though HCJFS forced John Doe into ongoing Juvenile Court jurisdiction notwithstanding he is an adult, and even though HCJFS hijacked CPS's legal obligations to ensure that an informed IEP team makes educational decisions for John Doe, HCJFS is selectively letting John Doe call the shots when it suits the government's purposes but obstructing reunification of the family when the government chooses otherwise.

177.    John Doe's maternal grandfather, a physician, said this in October 2019, about John Doe's needs:  "It is clear that [John Doe] has oppositional defiant disorder, and that he has anger issues."  The grandfather added that John Doe "is in school only about two hours a day since two hours seems to be his limit of tolerance."  That two hours/day is in a contained classroom by himself.  The grandfather asserted:  "I can just about guarantee you that [John Doe] will not, under any circumstances, go to another school to get the education he did not receive while living in Lynchburg [Ohio with his foster parent]." John Doe's grandfather expressed that "It sometimes amazes me . . . how Sheila [the foster parent] can tolerate his continuing bad lifestyle decisions."

178.    John Doe's grandfather also said in October 2019 that John Doe's foster parent had caught John Doe using marijuana on a few occasions and that she did not know what to do about it.  Marijuana is very contraindicated for a person taking John Doe's medications.

179.   In October 2019, during their first approved visit in months, John Doe told Melissa that John Doe's grandfather will not allow O.B. to join the grandfather and John Doe when they visit.

180.   John Doe also told Melissa during that visit that he was thinking about enrolling in the Army Reserves and that if he did he would never have to go into combat.   When Melissa encouraged John Doe to research his options he responded to his mom that he could not do any research about his options in life because he was not allowed a computer or a phone.

181.   John Doe told Melissa that John Doe was to blame for his predicament and that he "acted stupid."  He told Melissa that HCJFS was going to get him an apartment.

182.   At the October 2019 meeting, Melissa showed John Doe a video prepared by O.B. The video ended with O.B. telling John Doe "I love you" and John Doe then responded to the video "I love you too, bro."

183.   Leslie Mitchell, John Doe's aunt, attests (attached **Exhibit B**) that John Doe "has struggled with behavioral issues his whole life . . . . He had difficulty controlling his anger and was often aggressive toward other children."  She added:  "He was hospitalized at times, expelled from schools, and caused trauma at home."  John Doe's aunt emphasized: "Melissa desperately wanted to get John Doe the help he needed while providing a safe and stable life at home for O.B."  Ms. Mitchell expressed:  "I did not allow my children to be alone with John Doe for their safety."  Corroborating the facts provided by Melissa, Ms. Mitchell states:  "I helped persuade Melissa to consider abandoning custody.  I was terrified for O.B.'s physical and mental welfare."

184.   Erica English Buehler, a former professional caregiver for John Doe and trained to help children with special needs, who has worked as a special education intervention specialist, attests that John Doe's behavior was "at times uncontrollable," he would "throw things and destroy property," "try to physically hurt those in his way," "threatened O.B. on multiple occasions in my presence," had to be restrained, and was far behind academically.  Ms. Buehler's affidavit (attached **Exhibit C**), attests that when she saw John Doe on his 18th birthday she and her husband "were both shocked at his appearance" and also his "plans for the future."

185.   Upon information and belief, CPS appointed a "surrogate parent" for John Doe who knows very little about his disabilities and needs, knows very little about how to help John Doe progress in all domains, and knows very little, if anything, about how to help John Doe transition in ways that will allow him to engage in further education, employment, and independent living.  John Doe does not know the so-called "surrogate parent's" name, she has never spoken with John Doe, he is not able to communicate with her, and they have no relationship whatsoever.  CPS, Lynchburg, HCJFS, and ODE failed to appropriately use this mandated oversight protection for John Doe.

186.   The Hamilton County Prosecutor's office recently stated that the Defendants' intent is for John Doe to receive a diploma in May 2020.  Nevertheless, at the recent first visit between Melissa and John Doe in months that HCJFS allowed, John Doe told Melissa he was graduating high school in December 2019.  In response to the immediacy of this lawsuit, the Defendants claim to be requesting that John Doe's educational needs should be reevaluated at this very late date but they are not including Melissa in that process.

187.    The Defendants have recently mentioned that it is possible OOD will being working with John Doe for several months now that John Doe is approaching 19-years old.  By contrast, OOD's own website indicates that its "model supports earlier engagement, beginning at age 14."   OOD was supposed to timely provide access to vocational rehabilitation counselors but that did not occur for John Doe.  OOD's model is supposed to promote "person-centered planning," "vocational guidance and counseling," and "employment services."  To Melissa's knowledge, John Doe did not receive those OOD services.  OOD's website identifies "Evidence-Based Predictors for Transition Youth" for post-school success but John Doe has none of those predictors.  HCJFS, CPD, and Lynchburg were responsible for providing timely and proper transition services to John Doe but they knowingly failed to do so.

188.   On November 7, 2019, the Assistant Hamilton County Prosecutor stated that whether Melissa may appear at a November 27, 2019, hearing in Hamilton County Juvenile Court is "up to the Magistrate.  Melissa is not a party in the case and Juvenile Court dependency cases are not in general open to the public.  I don't believe HCJFS will object to Melissa's presence . . . . Max's GAL is a party to the case and may have a position on Melissa's presence."  Melissa has heard these words before from Hamilton County officials but nevertheless was not permitted to either attend or appear on the record in Juvenile Court.

189.   On November 8, 2019, John Doe told Melissa that the previous week Lynchburg had exited John Doe from its educational programming and had told John Doe he no longer needed to attend his isolated individual credit recovery class.

190.   On November 8, 2019, John Doe told Melissa that he continues to regularly use marijuana.  HCJFS has taken no action to address the heightened risk to John Doe of his regular marijuana use.   Given John Doe's medications and other contraindications, and given their legal obligations as custodian and as mandated reporters, HCJFS and its agents have unlawfully placed John Doe in imminent danger of serious and irreparable injury.

191.   On November 8, 2019, John Doe told Melissa that OOD is still not communicating with him and still not working with him.  John Doe told Melissa:  "I don't know how to make eggs."  John Doe added:  "It is taking OOD forever."

192.   The school districts' conduct established above denied John Doe access to educational opportunity and benefit, both compared to typical students and compared to other students with disabilities.

193.   All that stands in the way of the Defendants' irreparable destruction of John Doe's life are the Plaintiffs' claims and this Court's equitable and legal authority.

## COUNT I

### DEPRIVATION OF A FREE AND APPROPRIATE PUBLIC EDUCATION UNDER IDEA AND SECTION 504 [CPS, LYNCHBURG-CLAY, ODE]

194.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

195.   Melissa and O.B. are the intended household for John Doe.  CPS, Lynchburg, and ODE have deprived John Doe of FAPE, are precluding him from progressing in all domains, and are preventing Melissa and O.B. (John Doe's biological mother and brother) from being able to mutually benefit as a family and reunite with John Doe, in violation of the explicit purposes and  the spirit of IDEA and Section 504.

196.   Both IDEA and Section 504 require that CPS, Lynchburg, and ODE provide a FAPE to John Doe so that he will progress in all domains and be able to have subsequent education, employment, and independent living.

## COUNT II

### DEPRIVATION OF RIGHT TO REPRESENT JOHN DOE'S EDUCATIONAL INTERESTS UNDER IDEA, 20 U.S.C. 1415(m)(2) [CPS, LYNCHBURG-CLAY, ODE, HCJFS]

197.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

198.   Defendants have violated and continue to violate 20 U.S.C. 1415(m)(2) thereby depriving Melissa of her right to be the "appropriate person" representing John Doe's educational interests.

## COUNT III

### RETALIATION UNDER SECTION 504 AND THE AMERICANS WITH DISABILITIES ACT FOR ENGAGING IN PROTECTED ADVOCACY FOR A PERSON WITH DISABILITIES [HCJFS, CPS]

199.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

200.   42 U.S.C. 12203 prohibits a person from retaliation, interference, coercion, and intimidation against an individual who herself engages in protected conduct or assists another in the exercise of protected rights.

201.   Section 504 prohibits a person from retaliating against an individual who herself engages in protected conduct or assists another in the exercise of protected rights.

202. Case law holds that the ADA and Section 504 protect a non-disabled person from retaliation for assisting a disabled person, for advocating for FAPE and other rights for the disabled person, and for trying to become the power of attorney for a disabled person.

## COUNT IV

**RETALIATION UNDER THE FIRST AMENDMENT FOR ENGAGING IN CONSTITUTIONALLY PROTECTED EXPRESSION AND PETITIONING THE GOVERNMENT FOR REDRESS OF GRIEVANCES [HARRISON, HCJFS]**

203. Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

204. This claim is brought under 42 U.S.C. 1983 to vindicate Melissa's rights under the First Amendment.

205. Based on information and belief, final policymakers for HCJFS for matters governing the agency's control over John Doe (including but not limited to Harrison's supervisors) have ratified Harrison's retaliatory, predetermined, and arbitrary and capricious conduct toward Melissa.

206. Melissa engaged in First Amendment protected activity when she sought to advocate for John Doe's welfare by, among other conduct, filing State Complaints with ODE, speaking with John Doe, speaking with DRO, speaking with CPS, trying to access Probate Court, trying to access Juvenile Court, and otherwise speaking and acting to protect John Doe from ongoing lack of progress, protect him from ongoing injuries, and mitigate prospective risks to himself and others.

207. Defendant Harrison's actions against Melissa were undertaken deliberately and with intent.

208.   Melissa wants to speak with John Doe and inform him that he has his own cognizable claims for injunctive relief and monetary damages against the Defendants but the Defendants bar Melissa from sharing that information with John Doe.

209.   As a direct result of Defendants' conduct, Melissa suffered loss of constitutional rights, severe emotional distress, loss of income, pain and suffering, out-of-pocket expenditures, and other ongoing injuries.

## COUNT V

### SECTION 504/ADA DELIBERATE INDIFFERENCE TO EDUCATIONAL NEEDS AND PROGRAMMING AND DISABILITY-BASED STATUTORY DISCRIMINATION [CPS, LYNCHBURG, ODE]

210.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

211.   ODE has known since at least earlier in 2019, and CPS and Lynchburg have known for years, that John Doe was not properly progressing in all domains and that the school districts were not providing FAPE to John Doe.   The Defendants intend to soon prematurely exit John Doe from school without the ability for further education, employment, or independent living.

212. Defendants' intentional conduct constitutes unlawful disability-based discrimination against John Doe and makes it infeasible for Melissa and O.B. to reunite with John Doe in a common household.

213.   As a direct result of Defendants' conduct, Melissa and O.B., as the intended custodian of John Doe and actual brother, are being barred from the intended reunification of Melissa and O.B. with John Doe as a family, and have suffered loss of rights, severe

emotional distress, loss of income, pain and suffering, out-of-pocket expenditures, and other ongoing injuries.

## COUNT VI

**OHIO REVISED CODE 2151.353(F) UNCONSTITUTIONALLY DEPRIVES PLAINTIFFS OF THEIR RIGHTS TO REUNITE AS A FAMILY, VIOLATES THE ADA, AND UNLAWFULLY DISCRIMINATES BASED ON DISABILITY [STATE OF OHIO, HCJFS]**

214.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

215.   Ohio Revised Code 2151.353(F) categorically precludes Melissa and O.B. from reuniting with John Doe as a family because John Doe is defined by HCJFS as "developmentally disabled."

216.   HCJFS admits that it maintains control over John Doe without, in its opinion, needing any proof of incompetence, and even though he is an adult, because HCJFS deems that John Doe has a diagnosis of "developmentally disabled."

217.   Melissa and O.B. have equal protection, procedural due process, and substantive due process rights to reunite with John Doe as a family.  Melissa and O.B. have rights under the Americans with Disabilities Act to reunite with John Doe as a family without discrimination based on John Doe's disabilities. Those rights cannot be categorically and summarily blocked by the Defendants because John Doe is an individual with a disability. The Defendants do not similarly interfere with the rights of other biological mothers and brothers, or with the rights of any third persons, who seek to reunite as a family with persons who are *not* categorically classified as having a disability.

## COUNT VII

### DEPRIVATION OF 14TH AMENDMENT CLASS-OF-ONE EQUAL PROTECTION RIGHT [HARRISON, HCJFS, CPS]

218.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

219.   Defendants' conduct with respect to blocking Melissa, O.B., and John Doe from working together for his educational benefit and to reunite the family is arbitrary and capricious, motivated by *animus*, and deprives Melissa of her right to equal protection of the law.

220.   Based on information and belief, Defendants' conduct was ratified by final policymakers for HCJFS and CPS in this area.

## COUNT VIII

### DEPRIVATION OF 14TH AMENDMENT SUBSTANTIVE DUE PROCESS RIGHT TO BE A FAMILY [HARRISON, HCJFS, CPS]

221.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

222.   Defendants' conduct has deprived Melissa, O.B., and John Doe of their right to live as a family in a common household and help one another and benefit from each other.

223.   Based on information and belief, Defendants' conduct was ratified by final policymakers for HCJFS and CPS in this area.

## COUNT IX

### DEPRIVATION OF 14TH AMENDMENT PROCEDURAL DUE PROCESS RIGHT [HARRISON, HCJFS, CPS]

224.   Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

225.   The conduct of CPS, HCJFS, and ODE predetermined that they will not provide John Doe a FAPE and makes it infeasible for Melissa and O.B. to reunite with John Doe in a common household.  The Plaintiffs have the right to seek a unified household with John Doe under circumstances including that John Doe receives entitlements under law to an appropriate education and other services.

226.   The Defendants have also predetermined to block Melissa from receiving a power of attorney from John Doe, a constitutionally protected interest.

227.   Instead of using IDEA's mandated procedures after John Doe turned 18, and instead of using other constitutionally required means to try to control John Doe's education, the Defendants have instead unilaterally predetermined to maintain John Doe's education within their control.

228.   Defendants' unilateral predetermined conduct deprives Melissa and O.B. of their rights to procedural due process and the ability to reunite with John Doe as a family.

229.   Based on information and belief, Defendants' conduct was ratified by final policymakers for HCJFS and CPS in this area.

## COUNT X

**SECTION 504 DISCRIMINATORY DENIAL OF EQUAL ACCESS TO VOCATIONAL SCHOOL [CPS, LYNCHBURG-CLAY]**

230.  Plaintiffs incorporate by reference the foregoing facts and allegations in this Verified Complaint.

231.  CPS's and Lynchburg's discriminatory denial of equal access for John Doe to vocational school solely based on his disability-related need for a 1:1 aide while attending school deprives Melissa and O.B. of their ability to reunite with John Doe as a family.

**WHEREFORE, PLAINTIFFS DEMAND JUDGMENT AGAINST THE DEFENDANTS AS FOLLOWS:**

1) Preliminary and permanent injunctive relief against the Defendants requiring that they provide John Doe a free and appropriate public education reasonably calculated to allow him to progress in all domains.

2) An award of compensatory education services to John Doe sufficient to allow him to progress in all domains to the levels he would have progressed had CPS provide him FAPE in the first place.

3) Preliminary and permanent injunctive relief against the Defendants requiring that they approve Independent Educational Evaluations including all necessary transition assessments for John Doe, create an accurate Evaluation Team Report (ETR) after the IEEs, create an appropriate IEP and BIP after the ETR, including proper transition planning and services.

4) Preliminary and permanent injunctive relief against the Defendants with a Court-appointed Special Master authorized to retain expert professionals to assess John Doe in all areas of

suspected disability and to report to the Court their recommendations for serving John Doe's educational needs.

5) Preliminary and permanent injunctive relief having the Court directly inform John Doe about his rights and remedies under IDEA and for non-IDEA claims against CPS and Lynchburg for failing to provide John Doe an appropriate education, for discriminating against John Doe based on his disabilities, and otherwise acting unlawfully.  Consistent with this request for relief the Plaintiffs ask that the Court ascertain John Doe's ability to fully comprehend the ramifications of the Court's information and, if he does not fully understand, then allow a Special Master or other impartial and independent individual to make decision

6) Preliminary and permanent injunction relief requiring that John Doe be properly informed about John Doe's rights to pursue IDEA claims and non-IDEA claims against CPS, Lynchburg, and ODE for their deprivations of FAPE, disability-based discrimination, and other wrongs.

7) Preliminary and permanent injunctive relief against the Defendants requiring that they allow that John Doe appoint Melissa as his power of attorney for educational decision making.

8) Preliminary and permanent injunctive relief against the Defendants requiring that they appoint Melissa an appropriate individual under 20 U.S.C. 1415(m)(2) to represent John Doe's educational interests.

9) Preliminary and permanent injunctive relief against the Defendants requiring that they allow Melissa and O.B. to regularly communicate with and visit John Doe.

10) Preliminary and permanent injunctive relief against the Defendants requiring that they release records proving compliance with the adverse 2019 ODE Findings Letters.

11) Preliminary and permanent injunctive relief against the Defendants barring them from awarding John Doe a diploma and exiting him from CPS's obligations to educate John Doe until age 22.

12) Preliminary and permanent injunctive relief against ODE requiring that it directly provide FAPE to John Doe.

13) Preliminary and permanent injunctive relief against ODE requiring that it withhold IDEA funding from CPS.

14) Preliminary and permanent injunctive relief requiring that the Defendants allow John Doe to communicate with DRO or other independent counsel.

15) Preliminary and permanent injunctive relief ordering ODE to release to Melissa its records related to Melissa's State Complaints concluding that CPS had deprived John Doe of FAPE.

16) Monetary damages, both compensatory and punitive, in an amount determined by a jury for Melissa's pain and suffering and lost opportunities attributable to the HCJFS's and Harrison's unlawful retaliation against Melissa and deprivation of her constitutional and statutory rights, and sufficient to deter future intentional unlawful conduct.

17) An award of attorney fees and costs of this action as authorized by law.

18) Such other relief as the Court deems just.

Respectfully submitted,

/s/ Richard Ganulin
Richard Ganulin (0025642)
Attorney at Law
3662 Kendall Avenue
Cincinnati, Ohio 45208
(513) 405-6696
rganulin@gmail.com
www.richardganulin.com
*Attorney for Plaintiffs*

## **VERIFICATION**

State of Ohio           )

County of Hamilton   )

Melissa Brown, on behalf of herself and minor child O.B., Plaintiffs in this matter and being duly sworn, say that the factual allegations contained in this Complaint are true based on their knowledge.

_____
Melissa Brown

Taken, sworn to and subscribed before me this 18 day of November, 2019.



_____
Notary Public

59